IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AARP,                                        )
                                             )
          Plaintiff,                         )
     v.                                      )
                                             )
AMERICAN FAMILY PREPAID LEGAL                )
CORPORATION, INC., d/b/a AMERICAN            )
FAMILY LEGAL PLAN, HERITAGE MARKETING        )   Case No.: 1:07cv202
AND INSURANCE SERVICES, INC., STANLEY        )
NORMAN, JEFFREY NORMAN, MIKE                 )
FEDYNSIZYN, ROBERT MALARCHICK,               )
AMERICA'S RECOMMENDED MAILERS, INC.,         )
TINA HENNESSY, and TOM HENNESSY,             )
                                             )
          Defendants.                        )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

     This is an action by AARP against providers of certain
financial services and their marketing firms and principals for
allegedly engaging in a scheme to unlawfully pass off their
services as AARP-endorsed.  The Amended Complaint alleges
violations of the Racketeer Influenced and Corrupt Organizations
Act (federal "RICO"), 18 U.S.C. § 1962 (2000), and its North
Carolina analog, N.C. Gen. Stat. § 75D-1-14 (2007) (state
"RICO"), the Lanham Act, 15 U.S.C. §§ 1114, 1125, the North
Carolina unfair and deceptive trade practice statute, N.C. Gen
Stat. § 75-1.1, and North Carolina common law involving
trademark infringement, unfair competition, false designation of
origin, passing off and dilution.  (Doc. 3.)

Before the court are motions to dismiss the federal RICO claims by all Defendants (Docs. 19, 20 & 27), and to dismiss the state RICO claims by certain Defendants (Doc. 27), for failure to state a claim, pursuant to Rule 12(b)(6), Fed. R. Civ. P. Certain Defendants have also moved to dismiss the Amended Complaint for lack of personal jurisdiction, pursuant to Rule 12(b)(2), Fed. R. Civ. P., and, in the alternative, to dismiss any claims arising out of conduct other than activity directed toward North Carolina. (Docs. 19, 20 & 27.)

For the reasons set forth below, the court grants the motions to dismiss the federal RICO claims, which will be dismissed without prejudice, and it denies the motions as to the North Carolina RICO claims. The court denies the jurisdictional motions and concludes that specific jurisdiction exists over the individual Defendants as to the remaining claims. Finally, to the extent the Amended Complaint asserts claims relating to mailings directed outside of North Carolina, those claims are dismissed.

## I. BACKGROUND

The key facts are set forth below, while additional facts relevant to the various legal issues are addressed in the analysis to follow. On motion to dismiss, all facts are viewed in the light most favorable to AARP as the non-moving party. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

2

AARP is a District of Columbia corporation that describes itself as the largest membership organization in the nation and is devoted to promoting the interests of persons age 50 or older. (Doc. 3 ¶¶ 12, 13.) It claims membership of nearly half of all so-called "senior citizens" in America. (Id.) AARP allegedly owns federal trademark registrations for AARP financial services and receives substantial licensing fees for the use of its mark, which has a national reputation. (Id. ¶¶ 14-17.)

Defendants Heritage Marketing and Insurance Services, Inc. ("Heritage"), a California corporation, and American Family Prepaid Legal Corporation, Inc., d/b/a American Family Legal Plan ("American Family"), a California corporation, acting through their principals, Jeffrey and Stanley Norman,[1] both California residents, engaged in the business of offering financial services to senior citizens.[2] Collectively these Defendants, referred to in the Amended Complaint as the "Financial Services Defendants," marketed their services through

---

[1]  Stanley Norman, at all times relevant, was president of American Family and president (or chief executive officer of Heritage, he could not remember which); his son, Jeffrey Norman, was secretary and chief executive officer of American Family. (Doc. 41, Ex. B at 9, 11 & 56.)

[2]  Defendants Mike Fedynsizyn and Robert Malarchick were allegedly North Carolina-based sales associates who contracted with American Family and Heritage to personally call on potential customers in North Carolina. The case against Malarchick is stayed pursuant to 11 U.S.C. § 362, pending the resolution of his bankruptcy proceedings. (Doc. 70.)

3

contracts with Defendant America's Recommended Mailers, Inc. ("ARM"), a Texas corporation. (Doc. 42, Ex. A at 13-14.) ARM's principals are Tom and Tina Hennessy,[3] citizens and residents of Lewisville, Texas. (Doc. 21 ¶ 2; Doc. 22 ¶ 2.) ARM and the Hennessys are referred to collectively as the "Mail House Defendants."

AARP alleges that starting in about July 2004, the Financial Services Defendants and Mail House Defendants conspired to design, create, and mail millions of "lead generation cards" (or "lead cards") bearing the "AARP" mark to senior citizens to pique interest in living trusts, annuities and other financial products and services offered by the Financial Services Defendants. (Doc. 3 ¶¶ 103, 108, 114 & 120.)

An illustrative lead card states as follows:

---

[3]   Tina Hennessy founded ARM and is its sole officer, shareholder and director; her husband, Tom Hennessy, has been its general manager since 2000. (Doc. 42, Ex. A at 11-12, 16-17.)

**AARP REPORT: FINDINGS ON PROBATE...**
**REDUCE TAXES ON SOCIAL SECURITY INCOME!**

**A RECENT AARP** REPORT FOUND, IN MANY CASES, THE OUTDATED PROBATE PROCESS CREATED UNREASONABLE LEGAL FEES ESTIMATED TO BE **$1.5** BILLION DOLLARS NATIONALLY EACH YEAR!

*Depending on the value of your estate, upon your death, probate costs and estate taxes could be a heavy burden for your heirs to pay.*

There are now Federal tax laws passed that will legally enable you to reduce paying income taxes on interest income from your **CD's**, Money Market Funds and Social Security Income.

**FOR FREE** HARD FACTS AND STRAIGHT ANSWERS ON HOW THIS CAN AFFECT YOU AND YOUR HEIRS, RETURN THIS POSTAGE-PAID CARD TODAY! THERE IS NO COST OR OBLIGATION.

Signature _____

Age _____    Spouse _____

(____)_____
Phone (work)

(____)_____
Phone (home)

(NOTE: Area Code And Phone Number Ensures Proper Routing).

NOT AFFILIATED WITH ANY GOVERNMENT AGENCY OR AARP.

EST16 1096

(Doc. 3, Ex. A.) Defendant Stanley Norman takes credit for originating the idea to market financial services by referring to the AARP study. (Doc. 41, Ex. B at 10-13.) American Family sent original designs of some lead cards to ARM and the Hennessys. (Doc. 42, Ex. A at 125.) Tom Hennessy testified, however, that the text of one of the lead cards, ARM-0002 (Id., Ex. A, Ex. 2), was modified "part under their [American Family's] direction" and "part under ours." (Id., Ex. A at 132.) He characterized the design as a "collaborative effort" between ARM and American Family. (Id., Ex. A at 130.) Tina Hennessy also had some input on the card, indicating that she "may have reworded a few things on it" but cannot recall

5

what she did. (Id., Ex. B at 73-75.) There is no affirmative testimony that the Hennessys modified any of the text referring to AARP. However, at least one other version of the lead card containing reference to the AARP study was a "stock" mailer ARM had sent out on behalf of other customers. (Id., Ex. A at 127.) Tom Hennessy testified that the "stock" lead cards predated his employment with ARM in 2000. (Id., Ex. A. at 127-128.)

The Financial Services Defendants contracted with ARM to mail the lead cards and to process responses from potential customers. (Doc. 3 ¶¶ 19-20, 40-90.) ARM mailed the lead cards to a list of people matching criteria identified by American Family, collected the responses from those who sought more information, and redirected respondents to American Family. (Id. ¶ 27.) Respondents seeking more information were contacted by sales representatives (including Defendants Fedynsizyn and Malarchick) employed by the Financial Services Defendants, and a home-visit was set up during which high-pressure sales tactics were allegedly used to "browbeat seniors into buying financial services." (Id. ¶¶ 40-90.) AARP alleges that the lead cards misled seniors into believing that the mailings and subsequent services originated from, were endorsed by, and/or were affiliated with, AARP, when in fact they were not. (Id. ¶¶ 26-30, 40-90.) As a consequence, AARP charges, many senior citizens were defrauded into purchasing services they thought

6

were associated with AARP. (Id.) AARP alleges that it lost income and royalties, as well as goodwill, because potential customers were lured away from actual AARP-endorsed financial services. (Id. ¶ 91.)

AARP filed its lawsuit on September 14, 2006, in Guilford County, North Carolina, Superior Court, and amended the complaint effective February 28, 2007, to add claims under the Lanham Act and federal RICO. (Doc. 1.) Defendants removed the action to this court and filed the collection of instant motions.[4]

## II.  RICO CLAIMS

### A.  Federal RICO

The Amended Complaint seeks recovery under "18 U.S.C. Section 1962" without further specification, though AARP clarified at oral argument that it is proceeding under section 1962(c).[5]  (Doc. 3 ¶¶ 93-100.)  To state a claim under section 1962(c), a RICO plaintiff must prove that the defendant "conducted or participated in the conduct of the affairs of an enterprise engaged in interstate commerce through a pattern of

---

[4]  Remand was not sought although it appears to have been available because the original complaint was removable under 28 U.S.C. § 1332. See Ellenburg v. Spartan Motors Chassis, Inc., 519 F.3d 192, 198-99 (4th Cir. 2008).

[5]  At one point the Amended Complaint alleges that the Financial Services Defendants and the Mail House Defendants constitute an enterprise that has "conspired to engage" in the predicate acts. (Doc. 3 ¶ 39.)  A conspiracy would be subject to a claim under 18 U.S.C. § 1962(d).

racketeering activity." United States v. Norton, 17 F. App'x 98, 101 (4th Cir. 2001) (citing Salinas v. United States, 522 U.S. 52, 61 (1997)). Thus, section 1962(c) requires proof of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); accord R.J. Reynolds Tobacco Co. v. S K Everhart, Inc., No. 1:00CV00260, 2003 U.S. Dist. LEXIS 13440, at *10 (M.D.N.C. July 31, 2003). In dispute here is whether AARP has sufficiently alleged the existence of a RICO "enterprise." AARP alleges that "[t]he Mail House Defendants [] and the Financial Services Defendants [] have formed an enterprise that is engaged in a pattern of racketeering activity." (Doc. 3 ¶ 94.) AARP contends that these Defendants constitute an association-in-fact enterprise based on a pattern of conduct predicated on mail fraud and trademark counterfeiting. (Id. ¶¶ 19-33, 39-89; Doc. 31 at 4.)[6]

A motion under Rule 12(b)(6) should be granted only where, assuming the truth of all allegations in the Amended Complaint, a plaintiff fails to allege sufficient facts entitling it to relief. Fed. R. Civ. P. 12(b)(6); Twombly, 127 S. Ct. at 1965. All factual allegations must be construed in the light most

---

[6] Defendants' argument that mail fraud cannot be a predicate offense for a RICO claim because of a lack of first-party reliance (Doc. 20 at 9-10; Doc. 36 at 7-9) has been rejected by Bridge v. Phoenix Bond & Indem. Co., 128 S.Ct. 2131, 2145 (2008), which issued after briefing was submitted.

favorable to the Plaintiff. <u>Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.</u>, 991 F.2d 94, 97 (4th Cir. 1992). And, the complaint must have enough facts to state a claim that is above the speculative level and plausible on its face. <u>Adcock v. Freightliner LLC</u>, 550 F.3d 369, 374 (4th Cir. 2008). The court should not dismiss a claim by insisting that a plaintiff allege specific facts "beyond those necessary to state a claim and the grounds showing entitlement to relief." <u>Twombly</u>, 127 S. Ct. at 1973-74.

### 1.   RICO "person" and "enterprise" distinctness

Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Unlike section 1962(a), section 1962(c) "envisions the enterprise as being different from, not the same as or part of, the person" against whom recovery is sought. <u>New Beckley Mining Corp. v. Int'l Union, United Mine Workers</u>, 18 F.3d 1161, 1163 (4th Cir. 1994) (internal citations and quotations omitted); <u>Busby v. Crown Supply, Inc.</u>, 896 F.2d 833, 841 (4th Cir. 1990) (en banc) (affirming the necessity of distinction between the "person" and the "enterprise" in actions alleging a violation of § 1962(c)).

AARP's Amended Complaint does not define the "person(s)" but alleges that the Mail House Defendants and the Financial Services Defendants constitute the enterprise and are all engaged in the racketeering activity. (Doc. 3 ¶ 39.) AARP thus casts the same group of actors as being both "persons" and the "enterprise." Defendants argue that by doing so AARP's Amended Complaint lacks the requisite distinctness between the "person" undertaking the racketeering conduct and the "enterprise" with which such person is associated.

Defendants misread the standard of distinctness. The "enterprise" and a "person" cannot be one and the same because under the statute a "person" cannot be "employed" by itself. For that reason New Beckley Mining, upon which Defendants rely, is distinguishable because the union defendant was both the person and enterprise. 18 F.3d at 1163. United States v. Computer Sci. Corp., 689 F.2d 1181, 1190-91 (4th Cir. 1982), is also distinguishable because the corporation and its unincorporated divisions constituted both the person and enterprise. Accord Busby, 896 F.2d at 841 n.8. A corporation may associate with others, however, "to form an enterprise that is sufficiently distinct from itself." Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994) (dismissing claim where employer and employees were both defendants and alleged enterprise); Eason v. Merrigan, No. DKC

10

2003-0933, 2004 WL 903756, at *2 (D. Md. Apr. 28, 2004) (same).
An enterprise may even consist of an association of individuals
and corporations. Nunes v. Merrill Lynch, Pierce, Fenner &
Smith, Inc., 609 F. Supp. 1055, 1065 (D. Md. 1985). RICO claims
have been sustained under section 1962(c) where there is only
partial overlap between the person and the enterprise, Jacobson
v. Cooper, 882 F.2d 717, 720 (2d Cir. 1989), and where the
defendant may be a RICO person yet one of a number of members of
the alleged enterprise, Cullen v. Margiotta, 811 F.2d 698 (2d
Cir. 1987); Superior Bank, F.S.B. v. Tandem Nat'l Mortgage,
Inc., 197 F. Supp. 2d 298, 325 (D. Md. 2000).[7] See G. Robert
Blakey, The RICO Civil Fraud Action in Context:  Reflections on
Bennett v. Berg, 58 Notre Dame L. Rev. 237, 286 (1982).

Here, each Defendant, although part of the alleged
enterprise, is distinct from it.  Thus, Defendants meet the
distinctness requirement, and their motion to dismiss the
federal RICO claim on this basis is denied.

---

[7]   It is difficult to conclude that the court's statement in Entre
Computer Ctrs., Inc. v. FMG of Kansas City, Inc., 819 F.2d 1279 (4th
Cir. 1987), requires a different result.  There the court stated:
"[A]ssuming a corporation can be part of an 'association in fact,' the
central question is whether it can combine with other entities to form
an enterprise, when it is already the 'person' whose behavior the Act
is designed to punish.  Computer Sciences answers that question in the
negative." Id. at 1287.  While the facts of the case are not set out
in detail in the opinion, it appears that the court's statement was in
regard to the fact that the alleged enterprise was the corporate
defendant and its franchises, thus demonstrating application of the
rule set out above that corporations and their closely aligned
entities cannot constitute both the RICO enterprise and the person.

## 2. Association-in-fact enterprise

Under RICO, two categories of associations can fulfill the "enterprise" requirement: legal entities (such as corporations and partnerships); and "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The latter is known as an "association-in-fact" RICO enterprise. The Supreme Court has described it as "a group of persons associated together for a common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583 (1981). A RICO enterprise is characterized by "continuity, unity, shared purpose and identifiable structure." United States v. Fiel, 35 F.3d 997, 1003 (4th Cir. 1994) (internal citations and quotation marks omitted).

### a. Common purpose

AARP argues that the enterprise shared a common purpose to make money by defrauding seniors into believing that certain living trusts, annuities, financial and insurance products sold by American Family and Heritage were AARP-endorsed. The Defendants argued at the hearing on these motions, though not in their briefing, that making money alone cannot suffice as a common purpose.

An association-in-fact enterprise requires demonstration of a common purpose which animated its members. Turkette, 452 U.S. at 583. This can be established "by evidence of an ongoing

12

organization, formal or informal, of those associates in which they function as a continuing unit." United States v. Tillett, 763 F.2d 628, 631 (4th Cir. 1985) (quoting United States v. Griffin, 660 F.2d 996, 1000 (4th Cir. 1981)) (internal quotation marks omitted). Such proof may be direct or circumstantial. Griffin, 660 F.2d at 1000. The members of an enterprise do not have to share all objectives as long as they have one in common. United States v. London, 66 F.3d 1227, 1244 (1st Cir. 1995).

In many RICO cases, the common purpose is to share in the ultimate illegal goal of the enterprise. See, e.g., United States v. Batts, 171 F. App'x 977, 981 (4th Cir. 2006) (finding that a common purpose of dealing cocaine existed where gang members looked out for police, protected each other, referred drug buyers to other gang members for purchases, took turns selling, had a hierarchy of command, and committed violent crimes to preserve their turf); United States v. Najjar, 300 F.3d 466, 485 (4th Cir. 2002) (finding common purpose between defendant-employee and the corporation based on evidence that defendant-employee acted on behalf of and with intent to benefit the corporation). A goal of making money establishes a common purpose where the enterprise members sought to profit from the alleged illegal activity. Tillett, 763 F.2d at 630-31 (finding common purpose of enterprise was to make money through the

illegal trafficking of marijuana); <u>Reynolds Tobacco</u>, 2003 U.S. Dist. LEXIS 13440, at *11-12 (finding complaint stating entities had common purpose "to promote R.J. Reynolds cigarettes to consumers in order to increase R. J. Reynolds' market share among adult smokers, while simultaneously increasing adult smoker traffic in retailers' stores," sufficiently alleged an association-in-fact); <u>see also</u> <u>Williams v. Mohawk Indus., Inc.</u>, 465 F.3d 1277, 1284 (11th Cir. 2006) (holding complaint alleging members of an enterprise stood to gain substantial financial benefits from the employment and harboring of illegal workers satisfied common purpose requirement under RICO). However, while for obvious reasons making money is frequently the common purpose in RICO enterprises, RICO does not require that either the enterprise or the predicate acts be motivated by an economic purpose. <u>Fiel</u>, 35 F.3d at 1003.

The Amended Complaint alleges that American Family and Heritage are in the business of selling financial services and products and that the Mail House Defendants "sell unauthorized lead cards featuring Plaintiff's famous trademark AARP."[8] (Doc. 3 ¶¶ 19, 28-29.) AARP also alleges that "[t]he counterfeit AARP cards used and designed by the Financial

---

[8] AARP alleges that ARM and the Hennessys provide infringing lead cards not just to the Financial Services Defendants but to other insurance agencies and financial service companies throughout the United States. (Doc. 3 ¶¶ 19-20.)

Services Defendants and the Mail House Defendants cause seniors to believe that they are dealing with AARP and that the financial and insurance products and services of the Financial Services Defendants'[sic] are AARP-endorsed." (Id. ¶ 40.) Thus, the Amended Complaint implicates the Mail House Defendants in the design of the lead cards and charges that all Defendants intended to mislead recipients. (Id. ¶ 40.) To be sure, the purpose of the scheme was to *actually sell* the Financial Services Defendants' *products* to allegedly unsuspecting buyers, and there is no allegation or evidence that ARM or the Hennessys either were involved in, or benefitted from, any of those sales. Rather, ARM operated through contracts with the Financial Services Defendants to mail the lead cards to senior citizens throughout the United States, including in North Carolina, and to collect responses. (Id. ¶ 19; Doc. 42, Ex. A at 71, 98-110, 263-64). ARM's involvement appears to have ended after it collected names of responders, and ARM's payment is not alleged to have been contingent upon any sale by the Financial Services Defendants.

This case is very similar to In re Pharmaceutical Industry Average Wholesale Price Litigation, 307 F. Supp. 2d 196 (D. Mass. 2004). There, plaintiffs alleged an association-in-fact enterprise of certain pharmaceutical companies and publishers to falsely publish the manufacturers'

15

average wholesale prices ("AWP"). The complaint alleged that the publishers were aware of the manufacturers' scheme to perpetuate the use of false AWPs but published the information anyway. Id. at 204. In assessing whether a common purpose existed, however, the court noted that "[w]hile some of these factors may support an inference that some publishers may have been aware of concerns by governmental entities about inflated AWP's, they are insufficient to draw a reasonable inference that each of the publishers knew of the fraudulent nature of the AWP's for the identified drugs." Id. The court concluded that "without a shared illegal purpose to defraud, the shared innocent objective of using AWP as a published benchmark would not support a claim of a RICO enterprise" and dismissed the claim. Id. at 205.

Here, the Amended Complaint alleges that the Mail House Defendants and the Financial Services Defendants not only knew of the alleged fraud but, unlike in *In re Pharmaceutical Industry*, participated in it. Further, AARP alleges that all Defendants continued to distribute the lead cards after being specifically warned that their conduct infringed AARP's rights. (Doc. 3 ¶¶ 23, 31.) While the Mail House Defendants may not have shared in all the goals of the enterprise, it is sufficient that they are alleged to have shared an illegal purpose to defraud. *In re Pharm. Indus.*, 307 F. Supp. 2d at 205.

16

Therefore, the court finds that AARP has, at this pleading stage, alleged sufficient facts to state a claim that the alleged enterprise shared the common purpose of defrauding seniors into believing that the Financial Services Defendants' products were AARP-endorsed and thereby profiting as a result.

### b. Enterprise Structure

Defendants argue finally that AARP fails to allege the existence of an enterprise that is separate and apart from the racketeering activity. (Doc. 20 at 7-8.) They contend that the Amended Complaint lacks any allegation that the enterprise undertook any joint activity or acted in concert for any purpose outside the activities alleged to constitute the pattern of racketeering.[9] (Id.)

In Turkette, the Court stated that an enterprise is "proved by evidence of an ongoing organization, formal or informal," while the "pattern of racketeering" is "proved by evidence of the requisite number of acts of racketeering." 452 U.S. at 583. The "enterprise" is not the "'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." Id. The Court observed that the proof

---

[9] AARP points to the statements in Turkette that an enterprise may also be proved by demonstrating it operated as a "continuing unit." (Doc. 31 at 9.) The Fourth Circuit appears to analyze the continuity element as proof of a common purpose, United States v. Tillett, 763 F.2d 628, 631-32 (4th Cir. 1985), which the court has already addressed.

used to establish these elements may, in particular cases, coalesce, but it cautioned that "proof of one does not necessarily establish proof of the other." Id.[10]

Fourth Circuit law presently requires that "the association exist[] separate and apart from the pattern of racketeering activity in which it engages." Tillett, 763 F.2d at 631 (citing Turkette, 452 U.S. at 583). This can be shown through evidence that the enterprise had "an existence beyond that which was necessary to commit the predicate crimes." Id. at 631. Thus, evidence that the enterprise existed in the intervals between the predicate acts suggests an ongoing enterprise. Id. at 632. There must be some organizational structure that removes simple conspiracies from its reach. Richmond v. Nationwide Cassel L.P., 52 F.3d 640, 645 (7th Cir. 1995) (ruling that an enterprise "must be more than a group of people who get together to commit a 'pattern of racketeering activity'"). Focusing on the enterprise structure highlights the fact that it is the defendant's conduct in relation to the enterprise that is "the essence of a RICO violation." Reynolds v. East Dyer Dev. Co., 882 F.2d 1249, 1251 (7th Cir. 1989).

---

[10]    Whether an association-in-fact enterprise requires proof of an ascertainable structure beyond that inherent in the commission of predicate crimes is presently before the Court and awaiting decision. Boyle v. United States, No. 07-1309, 129 S. Ct. 29 (U.S. argued Jan. 14, 2009); see Brief for the Petitioner, Boyle v. United States, 129 S. Ct. 29 (2008) (No. 07-1309).

Neither party has cited, nor has the court found, any precedent in the Fourth Circuit as to the extent to which a RICO complaint must allege the requisites of an "enterprise" as set forth in Turkette. Tillett was decided on a full record after conviction and therefore does not speak directly to the issue. 763 F.2d at 630-61. The circuits are split in their approach. See, e.g., City of New York v. Smokes-Spirits.com, Inc., 541 F.3d 425, 451 (2d Cir. 2008) (affirming dismissal of civil RICO claim for failure to allege facts supporting Turkette factors); Odom v. Microsoft Corp., 486 F.3d 541 (9th Cir. 2007) (holding enterprise does not require separate structure and finding sufficient under Turkette a complaint alleging enterprise had common purpose, ongoing organization, and continuing unit); Asa-Brandt, Inc. v. ADM Investors Servs., Inc., 344 F.3d 738, 752 (8th Cir. 2003) (noting requirement of separate enterprise structure but affirming grant of summary judgment for lack of proof); Pavlov v. Bank of New York Co., 25 F. App'x 70, 71 (2d Cir. 2002) (holding complaint sufficiently alleged enterprise without pleading centralized hierarchy formed for the sole purpose of carrying out a pattern of racketeering acts); United States v. Patrick, 248 F.3d 11, 19 (1st Cir. 2001) (refusing to require structure requirement in jury instructions); Begala v. PNC Bank, Ohio, Nat'l Ass'n, 214 F.3d 776, 781-82 (6th Cir. 2000) (dismissing complaint for failing to allege Turkette

19

factors); <u>Richmond</u>, 52 F.3d at 645 (same); <u>Montesano v. Seafirst Commercial Corp.</u>, 818 F.2d 423, 427 (5th Cir. 1987) (same); <u>Seville Indus. Mach. Corp. v. Southmost Mach. Corp.</u>, 742 F.2d 786, 790-91 (3d Cir. 1984) (holding <u>Turkette</u> factors are burden of proof, not pleading); <u>see also</u> 1-7 CIVIL RICO P 7.02, at 21 (Matthew Bender & Co., Inc. 2008) (noting that '[t]he importance of the proper pleading of RICO's enterprise element cannot be overemphasized"). The court must therefore make a determination on a statute that our circuit has already characterized as "tormented," <u>Combs v. Bakker</u>, 886 F.2d 673, 677 (4th Cir. 1989), and whose interpretation remains in flux at the moment.

The question here is to what extent the Amended Complaint must allege that the enterprise functioned with some type of ascertainable structure separate and apart from the predicate acts of mail fraud and trademark counterfeiting constituting the pattern of racketeering activity. (Doc. 3, ¶ 39.) AARP alleges generally that the Normans and Hennessys "direct[ed]" and "control[led]" "the illegal conduct" described in the Amended Complaint. (Doc. 3 ¶¶ 4, 5, 9 & 10.) AARP argues that these allegations support an inference of at least some management role. While that may be true as to the predicate acts, AARP importantly fails to charge involvement in the management of the alleged "enterprise" itself. <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 179-81 (1993); <u>cf.</u> <u>Davis v. Hudgins</u>, 896 F. Supp. 561, 567

(E.D. Va. 1995) (finding no enterprise on motion to dismiss where no management role alleged); <u>Limestone Dev. Corp. v. Vill. of Lemont</u>, 520 F.3d 797, 804-05 (7th Cir. 2008) (dismissing complaint for lack of factual allegations as to a system of governance, hierarchy, management or direction, headquarters or other indicator of a legal or illegal enterprise). AARP argues that the Amended Complaint further alleges multiple predicate acts in multiple states occurring over a span of three or so years. (Doc. 3 ¶ 90.) While true, there is no allegation that these activities constituted more than a collection of predicate acts, or a conspiracy to commit them. In fact, the allegations themselves are limited to discrete purchases and sales of ARM's services without any factual allegation of an ongoing, separate enterprise. (<u>Id.</u> ¶¶ 19, 26-27.)

AARP next urges that its allegations that the formation and existence of American Family and ARM as separate entities that engage in business other than the predicate acts suffice to demonstrate separateness of the enterprise from the racketeering activity. (Doc. 31 at 9-11.) Attempting to analogize to <u>Tillett</u>, AARP argues that the Amended Complaint alleges that the Financial Services Defendants purchased lead cards both with and without the AARP reference (although there is no allegation of the latter) from other entities not named as Defendants in this case, and that the Mail House Defendants likewise sold lead

cards (with and without the AARP reference, although there is no allegation as to the latter) to non-Defendants. (Doc. 3 ¶¶ 19 & 27.) This argument fails because AARP has alleged only that the *persons* in the enterprise continued to exist and do business beyond the predicate acts; nowhere is there an allegation that the enterprise, as alleged, existed. Moreover, unlike in <u>Tillett</u>, where the various legitimate businesses were formed *by the enterprise* to further the enterprise's goals, nowhere does the Amended Complaint allege that the *enterprise* formed any of the corporate Defendants. <u>Cf.</u> <u>Tillett</u>, 763 F.2d at 632 (noting that the enterprise established a seafood restaurant as a legitimate business front for the smuggling operation, purchased trucks and equipment, and formed a corporation to buy the boat used for smuggling). It also does not help, as AARP urges, to look to the admissions of the Defendants in their Answers. (Doc. 31 at 10-11.) Procedurally, on motions to dismiss, the court looks only to the allegations of the Amended Complaint. Fed. R. Civ. P. 12(b)(6). Moreover, for the reasons noted above, the Answers do not admit that the enterprise itself formed the other corporate Defendants or that it directed, or engaged in, such separate activities.

Defendants argue that the relationship between the parties is contractual and is best characterized as one of vendor and vendee. (Doc. 20 at 7.) Simple contractual relationships are

not ordinarily the stuff of which RICO enterprises are made. See Jubelirer v. MasterCard Int'l, Inc., 68 F. Supp. 2d 1049, 1052-52 (W.D. Wis. 1999) (holding that a contractual combination for financial services failed to constitute an enterprise). This is true even if some actors, for example the Mail House Defendants, performed improper acts themselves, such as the mailing of allegedly infringing lead cards. (Doc. 3 ¶ 19.) What is required is participation in the operation and management of the alleged enterprise. Reves, 507 U.S. at 179-81. As the Fourth Circuit has cautioned, due to RICO's heightened penalties, courts should "not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." Flip Mortgage Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1988).

While the Supreme Court has rejected the notion that Rule 8, Fed. R. Civ. P., sets a heightened pleading standard that requires that a complaint allege "specific facts" beyond those necessary to state a claim and the grounds showing entitlement to relief, Twombly, 127 S. Ct. at 1973-74, a pleading must still allege "enough facts to state a claim to relief that is plausible on its face." Id. at 1974. A well-pleaded complaint should not be struck even if actual proof of those facts may be improbable, id. at 1965, but there must still be sufficient facts alleged. This is especially true in a case

23

rested on predicate acts sounding in fraud and given RICO's complexity and incalculable stigmatizing effect. Id. at 1973 n.14. Twombly reaffirmed that district courts "must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed." Id. at 1967 (quoting Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 528 n.17 (1983)). This is especially important where, as here, the federal claim carries a certain *in terrorem* effect. Id. at 1966.

Construing all factual allegations in the light most favorable to AARP, Martin Marietta, 991 F.2d at 97, the court finds that the Amended Complaint, even though prolix, is largely a compilation of repetitive predicate acts and fails to sufficiently allege a RICO enterprise that existed separate and apart from the alleged racketeering activity. Though AARP alleges a conspiracy to commit the predicate acts of mail fraud and trademark counterfeiting, a conspiracy without more does not rise to the level of a RICO claim. There must be sufficient facts alleged from which to fairly infer an entity that exists separately in structure. Defendants' motion to dismiss AARP's federal RICO claim (Doc. 19) will therefore be granted, but because the deficiency may reflect merely a defect in pleading and not in fact, and given the pendency of Boyle in the Supreme

24

Court which could affect this analysis, the claim will be dismissed without prejudice.

**B.   North Carolina RICO**

The Financial Services Defendants also move to dismiss AARP's claims under the North Carolina RICO statute, N.C. Gen. Stat. § 75D-1-14, relying on their arguments as to the "enterprise" element of the federal claim without any independent analysis. (Doc. 19 at 1-2; Doc. 20 at 5; Doc. 27 at 4.) AARP provides no specific analysis other than to correctly point out that the North Carolina RICO statute does not require proof of an "enterprise."[11]   (Doc. 31 at 4.)   N.C. Gen. Stat. § 75D-4; Delk v. ArvinMeritor, Inc., 179 F. Supp. 2d 615, 628 n.5. (W.D.N.C. 2002).   Thus, Defendants' motion to dismiss, to the extent it sought to address the North Carolina RICO statute with respect to any "enterprise" requirement, is denied.

**III.   MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Individual Defendants Tom and Tina Hennessy and Stanley and Jeffrey Norman move to dismiss the remaining claims against them for lack of personal jurisdiction, pursuant to Rule 12(b)(2), Fed. R. Civ. P.   (Docs. 19, 20 & 27.)   Defendants also

---

[11]   North Carolina's RICO statute states that "no person shall engage in a pattern of racketeering activity or through a pattern of racketeering activities or through proceeds derived therefrom, acquire or maintain, directly or indirectly, any interest in or control of any enterprise . . . ."  N.C. Gen. Stat. § 75D-4(a)(1).

collectively move to dismiss claims arising out of mailings directed outside North Carolina. (Id.)

### A. Personal Jurisdiction Standards

The parties in this case conducted jurisdictional discovery. Thus, AARP must demonstrate grounds for jurisdiction by a preponderance of the evidence. Trivette v. Risher, No. 7:07-CV-16-D, 2008 WL 516747, at *1 n.1 (E.D.N.C. Feb. 25, 2008); see Mylan Lab., Inc. v. Akzo, N.V., 2 F.3d 56, 59-60 (4th Cir. 1993).

To determine whether personal jurisdiction is proper, the court engages in a two-part inquiry: first, North Carolina's long-arm statute must provide a statutory basis for the assertion of personal jurisdiction, and second, the exercise of personal jurisdiction must comply with the Due Process Clause of the Fourteenth Amendment. Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001); Vogel v. Wolters Kluwer Health, Inc., No. 1:07CV62, 2008 WL 5453835, at *8 (M.D.N.C. Dec. 30, 2008). North Carolina's long-arm statute is construed to be coextensive with the Due Process Clause; therefore, the two requirements collapse into a single inquiry of whether the non-resident defendant has such "minimum contacts" with the forum state that exercising jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice."

26

Christian Sci., 259 F.3d at 215 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)); Red Bull GmbH v. RLED, LLC, 515 F. Supp. 2d 641, 646-47 (M.D.N.C. 2007). Jurisdiction over a defendant may be either general or specific. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8, 9 (1984). A court may exercise general jurisdiction over defendants who have systematic and continuous contacts with, or purposefully avail themselves of the privilege of conducing activities within, the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76 (1985). Minimum contacts exist where a non-resident defendant "purposefully directs" his activities toward the forum state. Id. at 473. If the nature of the contacts with the forum state falls below that required for the exercise of general jurisdiction, courts are authorized to exercise specific jurisdiction where the cause of action "aris[es] out of or relate[s] to" the defendant's contacts with the forum state. Helicopteros, 466 U.S. at 413-14.

### B. Tina and Tom Hennessy

The Hennessys are Texas residents. (Doc. 21 ¶ 2; Doc. 22 ¶ 2.) AARP contends that they have contacts with North Carolina that are "intentional, continuous and substantial." (Doc. 42 at 6.) In support, AARP points to admissions that ARM maintained a website (armleads.com) that was accessible in North Carolina and had clients in the state. (Id.)

27

Maintenance of a website on which a defendant advertises its services and which is accessible to North Carolina residents, without more, is an insufficient basis upon which to support a finding of general jurisdiction. ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711-12 (4th Cir. 2002); Burleson v. Toback, 391 F. Supp. 2d 401, 414 (M.D.N.C. 2005) ("it is well-settled in the Fourth Circuit that accessibility [of a website] alone cannot establish personal jurisdiction"). General jurisdiction sets a higher bar and usually requires that the website be more than a passive internet presence or that a defendant personally maintain ownership of the domain name, neither of which is alleged here. ALS Scan, 293 F.3d at 714-15; Mkt. Am. v. Optihealth Prod., Inc., No. 1:07CV855, 2008 WL 5069802, at *7-*8 (M.D.N.C. Nov. 21, 2008).

Tina Hennessy is an officer, and Tom Hennessy an employee, of ARM, and, as such, they are separate and distinct entities from it. May Apparel Group, Inc. v. Ava Imp.-Exp., Inc., 902 F. Supp. 93, 97 (M.D.N.C. 1995). The fact that ARM has customers in the state, without more, therefore fails to extend general jurisdiction to the corporate officers and employees merely because of their employment status. Uniprop Manufactured Hous. Cmties. Income Fund II v. Home Owners Funding, 753 F. Supp. 1315, 1319-1321 (W.D.N.C. 1990) (finding lack of jurisdiction

28

over non-resident officer and board member of out-of-state corporation with North Carolina branch office because plaintiffs failed to show sufficient individual contacts).[12]

Ordinarily, the acts of a corporate representative transacting corporate business cannot form the basis for the exercise of personal jurisdiction over the corporate representative in his or her personal capacity. <u>Columbia Briargate Co. v. First Nat'l Bank</u>, 713 F.2d 1052, 1055-56 (4th Cir. 1983). However, this "fiduciary shield" doctrine does not apply where the state's long-arm statute is co-extensive with due process. <u>Pittsburgh Terminal Corp. v. Mid Allegheny Corp.</u>, 831 F.2d 522, 525 (4th Cir. 1987). The relevant inquiry is the action taken by the officer or employee. Whereas "[g]eneral actions by such persons on behalf of the corporation will not generally subject them to an out-of-state court's jurisdiction, [] actions related to the events in question may do so." <u>Mkt. Am.</u>, 2008 WL 5069802, at *8. Whether a court may exercise such specific jurisdiction requires analysis of the

---

[12] At oral argument, Defendants cited <u>Saft Am. Inc. v. Plainview Batteries, Inc.</u>, No. 204A08, 2009 WL 279071, at *1 (N.C. Feb. 6, 2009) (adopting dissent from North Carolina Court of Appeals decision and reversing dismissal of jurisdictional motion by out-of-state officer), to resolve the issue whether North Carolina courts would exercise jurisdiction over the Hennessys and Normans. While this case may be helpful by way of analogy, the jurisdiction whose power the federal courts exercise is the United States of America, not the state of North Carolina. The proper inquiry, then, is whether the Defendants have sufficient minimum contacts under the Constitution. <u>See</u> <u>ISI Int'l, Inc. v. Borden Ladner Gervais LLP</u>, 256 F.3d 548, 551 (7th Cir. 2001).

following factors: (1) whether the defendant purposefully availed himself of the privileges of conducting activities in North Carolina, (2) whether the plaintiff's claims arise out of the defendant's activities relating to North Carolina, and (3) whether the exercise of jurisdiction is constitutionally reasonable. Christian Sci., 259 F.3d at 216.

AARP alleges that Tom and Tina Hennessy knew of, authorized and approved the mailing of two million infringing lead cards into North Carolina over a four-year period and that they received revenue from these mailings. (Doc. 42 at 6-7.) The Hennessys argue that neither had contacts with North Carolina, were involved in placing the allegedly infringing language onto the lead cards, or took part in their mailing into the state. (Doc. 20 at 12-14.) Tina Hennessy also argues that she ceased actively participating in the day-to-day operations of ARM in 1998 and that her involvement in ARM had become limited to payroll issues. (Doc. 42, Ex. B at 57-58, 66.)

Where an allegation sounds in tort, a court may exercise jurisdiction over a non-resident defendant who is a "primary participant[] in an alleged wrongdoing intentionally directed" at a resident in the forum state. Calder v. Jones, 465 U.S. 783, 790 (1984). Here, AARP's trademark infringement and remaining claims sound in tort. Mid Atl. Telecomm., Inc. v. Long Distance Servs., Inc., 18 F.3d 260, 263 (4th Cir. 1994)

30

(civil RICO is a statutory tort remedy); <u>Alitalia-Linee Aeree</u>
<u>Italiane S.p.A. v. Casinoalitalia.com</u>, 128 F. Supp. 2d 340, 348
(E.D. Va. 2001) (Lanham Act claims are tortious in nature);
<u>Richardson v. Bank of Am., N.A.</u>, 182 N.C. App. 531, 562, 643
S.E.2d 410, 429 (2007) (unfair and deceptive trade practices are
neither wholly tortious nor wholly contractual in nature);
<u>Henderson v. United States Fid. & Guar. Co.</u>, 124 N.C. App. 103,
109, 476 S.E.2d 459, 463 (1996) (unfair competition and passing
off are common law torts).  A corporate officer who actively
participates in a tort may be liable even if he or she was
acting in a corporate capacity.  <u>Blue Mako, Inc., v. Minidis</u>,
472 F. Supp. 2d 690, 701-702 (M.D.N.C. 2007) (finding
jurisdiction over non-resident corporate officer who allegedly
sent false and misleading or inaccurate information to North
Carolina to induce plaintiff to sign contract forming the basis
of the action).  In trademark infringement cases, a non-resident
employee-defendant may be held jointly and severally liable
"with that corporation if the individual defendant has direct
involvement in the infringing activities of the corporation."
<u>Musselwhite v. Int'l Learning Works, Inc.</u>, No. 2:97CV460, 1997
U.S. Dist. LEXIS 21427, at *7 (M.D.N.C. Oct. 17, 1997);[13] <u>accord</u>

---

[13]   <u>Musselwhite</u> is particularly relevant.  There, the court asserted
jurisdiction over an individual defendant who was the founder,
president, and majority owner of the corporate defendants because
there was evidence that he had called the plaintiff, a North Carolina
resident, to obtain a copy of the training material that was the

*Flexible Benefits Council v. Feltman*, No. 1:08CV371, 2008 WL 2465457, at *7 (E.D. Va. Jun. 16, 2008) (holding corporate officers and directors personally liable for trademark infringement, particularly where the individuals authorized and approved the acts of infringement); *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Robinson*, 123 F. Supp. 2d 965, 975 (W.D.N.C. 2000) ("trademark infringement is akin to tort cases and thus jurisdiction may attach when the defendant's conduct is either aimed at or has an effect on the forum state"); *see Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987) (reversing district court's exoneration of individual defendants from liability because they participated in corporation's willful infringement and, thus, may be held personally liable); *Rhee Bros., Inc. v. Han Ah Reum Corp.*, 178 F. Supp. 2d 525, 532 (D. Md. 2001) (allowing trademark claim to proceed against non-resident owner, operator and president of a non-resident corporation pending determination of whether the individual defendant was "culpably

---

subject of plaintiff's trademark infringement claim. 1997 U.S. Dist. LEXIS 21427, at *11. Requiring the plaintiff to make only a prima facie showing because no jurisdictional discovery had occurred, the court concluded that the evidence supported a reasonable inference that the individual defendant participated directly in the corporation's infringing conduct. Id. The court further concluded that the defendant's continued marketing of the product after being informed of possible trademark and copyright violations supported the inference that his actions were committed with knowledge that harm would occur in North Carolina. Id.

involved in the commission of a 'trademark tort'" in the forum state).

The record demonstrates sufficient evidence that Tina Hennessy, founder and sole officer, shareholder and director of ARM, and Tom Hennessy, its general manager since 2000 (Doc. 42, Ex. A at 11-12, 16-17), were aware of the corporate activity and collaborated in the development of the lead cards with knowledge that they would be mailed into the state and potentially cause injury here. Both Hennessys participated in the design of lead cards containing the phrase AARP that form the basis of AARP's trademark infringement claim. Tom Hennessy identified one of the cards at issue, ARM-00002, as having been provided by American Family "in text or another format." (Id., Ex. A at 125.) He explained that it was modified "part under their direction" and "part under ours" and characterized the design process as a "collaborative effort between ARM and [American Family]." (Id., Ex. A at 125, 130.) The original came from American Family, and Tom Hennessy had some input as to it because he was concerned about a "copyright issue" and did not think it should be mailed in the form he received it from American Family. (Id., Ex. A at 131-32.) He recalled talking with Julian Ford at American Family about the potential copyright issue but does not recall exactly what changes were made to the card as a result. (Id., Ex. A at 132-34.)

33

Tina Hennessy had input on the contents of at least one lead card containing the allegedly infringing AARP mark, ARM-00005. (Id., Ex. A, Ex. 2.) ARM-00005 is a lead card containing the AARP phrase which Tom Hennessy identified as a stock mailer that ARM sends on behalf of its customers. (Id., Ex. A at 127.) A "stock" mailer refers to "pieces that were created at some time at ARM and mailed with other clients at ARM." (Id., Ex. A at 127.) While Tina Hennessy denies having helped design ARM-00005, she stated that she "may have reworded a few things on it" but does not recall specifically how or what was reworded. (Id., Ex. B at 73-75.) To what extent the ARM-00005 card was shown to American Family and adapted for its use remains to be determined.[14]

There is, moreover, evidence showing that the Hennessys expressly aimed their actions toward North Carolina with the knowledge that harm in this forum was highly probable. See Calder, 465 U.S. at 789-90. Tom Hennessy received two cease and desist letters from AARP that were addressed to Tina Hennessy: one dated November 3, 2004; and the other February 9, 2005. In both letters, AARP's trademark attorneys requested that ARM cease mailing lead cards containing the AARP mark. (Doc. 42, Ex. A at 232-38, Exs. 6 & 7.) ARM sent out approximately 1.3

---

[14] Jeffrey Norman testified that ARM provided American Family with lead cards containing AARP language but did not specify which cards those were. (Doc. 41, Ex. A at 147)

34

million cards to North Carolina after the November 2004 cease and desist letter, and approximately 1.1 million cards to North Carolina after the February 2005 letter. (Id., Ex. A, Ex. 3.) Tom Hennessy conceded that he knew after receiving these letters that getting sued was "a very real possibility." (Id., Ex. A at 238.) Furthermore, on October 30, 2006, ARM sent approximately 64,000 lead cards to North Carolina on behalf of American Family. (Id., Ex. A, Ex. 3.) ARM sent these after the North Carolina Attorney General, on October 4, 2006, obtained a preliminary injunction from the Superior Court of Wake County, North Carolina, enjoining ARM and the Hennessys from, in pertinent part, "directly . . . sending out mailings or other written solicitations to North Carolina customers." (Id., Ex. A, Ex. 8 at ¶ 14). This also occurred after the original complaint in this case was filed in the Superior Court of Guilford County on September 20, 2006. (Doc. 1, Ex. A.) Tina stated that she "[couldn't] tell you if I did or I didn't" participate in the decision to stop mailing anything with AARP on it after this lawsuit began. (Doc. 42, Ex. B at 65-68.)

In sum, the evidence before the court indicates that AARP's claims arise from or relate to the Hennessys' purposeful direction of allegedly tortious activity into North Carolina for commercial gain with the knowledge that harm was likely to occur. See Calder, 465 U.S. at 790; Musselwhite, 1997 U.S.

Dist. LEXIS 21427, at *11.  The court finds that the
inconvenience to the Hennessys in defending this action in North
Carolina does not offend traditional notions of fair play and
substantial justice.  Consequently, the exercise of jurisdiction
over them is constitutionally reasonable, and the Hennessys'
Rule 12(b)(2) motion to dismiss for want of jurisdiction is
therefore denied.  <u>Christian Sci.</u>, 259 F.3d at 217-18.

### C. **Jeffrey and Stanley Norman**

Like the Hennessys, the Normans argue that this court lacks
jurisdiction over their persons.  (Docs. 19 & 27.)

AARP contends that the Normans have contacts with North
Carolina that are "intentional, continuous and substantial" and
that they have purposefully availed themselves of the privilege
of conducting business in this state.  (Doc. 41 at 5, 10.)  AARP
points to contacts between both of the Normans and North
Carolina to support this court's exercise of general
jurisdiction over them.  From 2002 to 2006, American Family and
Heritage had offices in North Carolina.  (<u>Id.</u>, Ex. A at 94-95,
120-122.)  Jeffrey Norman, acting in his corporate capacity,
executed a lease on May 15, 2004 for office space in North
Carolina on behalf of American Family while he was physically in
California.  (<u>Id.</u>, Ex. A at 272, Ex. 9 at 14.)  He also made two
visits to North Carolina.  The first was in 2003 to visit the
Greensboro facility for American Family, and the second was in

36

August 2005 to meet with legal counsel to obtain advice with regard to the North Carolina Attorney General's investigation into American Family and Heritage. (Id., Ex. A at 279, 285-288.)

Stanley Norman made four visits to North Carolina. On his first visit in 2003, he interviewed and hired a state marketing director. (Id., Ex. B at 17.) On September 30, 2004, while in North Carolina, he executed a lease for office space on behalf of American Family. (Id., Ex. A at 271-72.) His third visit occurred over two years later in October 2006, when he explained to employees the terms and conditions of the October 4, 2006 preliminary injunction issued by the Superior Court of Wake County. (Id., Ex. A at 20-21.) He made his fourth visit in February or March of 2007 to obtain legal advice about "the matter of the North Carolina attorney general." (Id., Ex. A at 32.)

The court concludes that the Norman's contacts with the state of North Carolina do not rise to the level of the type of continuous and systematic contacts to establish a basis for the exercise of general jurisdiction. See, e.g., Estate of Stephen Bank v. Swiss Valley Farms, Co., 286 F. Supp. 2d 514, 517-18 (D. Md. 2003) (finding lack of substantial contacts for out of state resident); Smith v. Jefferson County Chamber of Commerce, 683 F. Supp. 536, 538 (D. Md. 1988) (holding non-resident business

37

owners' monthly trips, deliveries, advertising to and significant gross revenue from forum state insufficient to constitute continuous and systematic contacts).

The record does reveal, however, that the Normans purposefully directed their activities related to the claims in this case toward North Carolina. As AARP argues, there is evidence that the core business model of American Family and Heritage, to solicit interest in their products, is founded upon the trademark infringing activity. Stanley Norman, as president of American Family and president or chief executive officer of Heritage, devised the plan to refer to the AARP probate study in the lead cards to implement the model and personally oversaw operations to mail the lead cards to North Carolina. (Doc. 41, Ex. B at 10-12.) Moreover, he personally participated in American Family's business operations in North Carolina to chase respondents generated from the lead cards until the North Carolina Attorney General enjoined them. (Id., Ex. B at 10-15.) The record thus demonstrates a high level of personal involvement in causing the allegedly infringing actions with knowledge of potential consequences in North Carolina. His son, Jeffrey Norman, as chief executive officer of American Family, personally authorized the mailings of approximately 1.5 million lead cards into North Carolina that contained the allegedly infringing AARP language to solicit sales. (Doc. 41, Ex. A at

38

155; Doc. 42, Ex. A, Ex.3.) Stanley Norman's response to the jurisdictional issue is a defense on the merits, contending that the lead cards contained both a truthful, fair use reference to a nationwide AARP study on probate conducted in the 1990s and a disclaimer that the mailings were not associated with AARP. (Doc. 41, Ex. B at 13.) The merits of the infringement claim, however, are not before the court on the present motions.

The record therefore contains sufficient evidence that the Normans participated directly in the alleged tortious conduct by authorizing and approving the creation and purposeful direction of lead cards containing AARP references to North Carolina. Given the Normans' participation in the alleged infringement that is causally-related to AARP's alleged damages, jurisdiction over them is appropriate. See Polo Fashions, 816 F.2d at 149; Stafford Urgent Care, Inc. v. Garrisonville Urgent Care, P.C., 224 F. Supp. 2d 1062, 1065-66 (E.D. Va. 2002) (holding jurisdiction was proper over individual defendants who incorporated the entity that used the allegedly infringing language in its signage with the intent to divert patients and business from plaintiff's facility); see also Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir. 1978) (imposing tort liability upon individual defendant who was central figure in the infringing corporation who authorized and approved the tortious acts that formed the basis of the corporation's

39

liability). The Normans' argument that there is no evidence the alleged tort of trademark infringement occurred in North Carolina (Doc. 27 at 9-10) is unavailing, as the harm in a trademark infringement case occurs at the place where the confusion occurs as well as where the infringing label is affixed. Robinson, 123 F. Supp. 2d at 972 (citing 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 32:39, and Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 218 (1st Cir. 1989)). Here, the alleged confusion is alleged to have taken place in North Carolina.

The Normans point to Rich Food Services, Inc. v. Rich Plan Corp., No. 5:99CV677BR, 2001 U.S. Dist. LEXIS 25956 (E.D.N.C. May 12, 2001), to argue that the fact that they were officers and directors of American Family and Heritage with knowledge and control over the corporations' alleged tortious activities is insufficient to confer personal jurisdiction over them. (Doc. 27 at 8.) As a general rule, their status and knowledge do not suffice for jurisdiction. Contrary to the Norman's contentions, however, Rich Food supports the assertion of specific jurisdiction. In that case, North Carolina plaintiffs had entered into a franchise agreement with the defendant, an out-of-state corporation. Rich Food, 2001 U.S. Dist. LEXIS 25956, at *2. As part of their agreement, plaintiffs were encouraged to sell their customers a Full Service Agreement

40

("FSA") and did so. _Id._ Plaintiffs were later sued by the North Carolina Attorney General because one of the FSA's provisions violated North Carolina law prohibiting unlicensed insurers (such as the plaintiffs) from selling insurance. _Id._ Plaintiffs in turn sued alleging, among other things, that the defendants fraudulently failed to disclose the FSA's noncompliance with North Carolina law. _Id._ at *4. The court held that specific jurisdiction could be asserted over defendants who had come to North Carolina to urge plaintiffs to sell the FSAs and who came to discuss with a plaintiff and his attorney the North Carolina Attorney General's investigation. _Id._ at *24. This is consistent with the assertion of jurisdiction over a corporate officer who allegedly sent false and misleading information into a state to fraudulently induce a plaintiff to sign a franchise contract. _Blue Mako_, 472 F. Supp. 2d at 701. _Blue Mako_ and _Rich Food_ thus support the assertion of specific jurisdiction where a defendant directly participates in the corporate tort either through the direct commission of fraud while present in North Carolina or by sending false and misleading information into the state.[15] _Id._; _Rich Food_, 2001 U.S. Dist. LEXIS 25956, at *24.

---

[15] Defendants' reliance on _Indiana Plumbing Supply, Inc. v. Standard of Lynn, Inc._, 880 F. Supp. 743 (C.D. Cal. 1995), is misplaced. There, the court found jurisdiction over a non-resident corporate employee lacking based on the Ninth Circuit standard that personal liability for corporate officers is only proper where the defendant is

In sum, the court finds that AARP has shown by a preponderance of the evidence that the Hennessys and the Normans sufficiently participated in and/or directed the alleged trademark infringement through purposeful activity directed to North Carolina. North Carolina has a sufficient interest such that defending this lawsuit here cannot be said to offend traditional notions of fair play and substantial justice. Accordingly, the Normans' motions to dismiss for lack of jurisdiction are denied.[16]

---

the "'guiding spirit' behind the wrongful conduct . . . or the 'central figure' in the challenged corporate activity." Id. at 750. Unlike the non-resident corporate director there who neither developed the advertising campaign that formed the basis of the infringement claim nor chose the advertisement containing the allegedly infringing phrase, id. at 751, Stanley Norman developed the concept of American Family, including the sending of lead cards referring to AARP, and Jeffrey Norman personally authorized the mailing of those lead cards into North Carolina. Such a level of involvement with awareness of the potential consequences within North Carolina meets even the test in Indiana Plumbing, were it to apply.

[16] In reaching this conclusion, the court declines to find that AARP has demonstrated personal jurisdiction over the Normans in part because both are alter egos of American Family and Heritage. (Doc. 3 ¶ 32.) Under North Carolina's "mere instrumentality rule," to pierce the corporate veil there must be evidence of a combination of factors which, taken together, suggest that the "corporate entity attacked had no separate mind, will or existence of its own." Monteau v. Reis Trucking & Constr., Inc., 147 N.C. App. 121, 127, 553 S.E.2d 709, 712 (2001) (internal citations and quotation marks omitted); see Atl. Tobacco Co. v. Honeycutt, 101 N.C. App. 160, 165-66, 398 S.E.2d 641, 643-44 (1990) (piercing corporate veil because individual defendant was president and sole shareholder of corporations, and evidence indicated that he dominated the corporations' activities). While there is evidence that the Normans had substantial control over the corporate activities of American Family and Heritage, AARP fails to provide evidence of inadequate capitalization, comingling of assets, or non-compliance with corporate formalities to demonstrate that the corporate entities had no separate mind, will, or existence. Atl. Tobacco, 101 N.C. App. at 164-65, 398 S.E.2d at 643.

## IV. CLAIMS AGAINST DEFENDANTS ARISING FROM CONDUCT OUTSIDE NORTH CAROLINA

Defendants argue that all claims against them not associated with mailings in North Carolina should be dismissed because, they contend, AARP cannot recover damages for conduct occurring outside North Carolina. (Doc. 19 at 3-4; Doc. 21 at 14-20; Doc. 27 at 11-15.) Because the court has dismissed the federal RICO claims, the issue relates to the remaining claims under state law and the Lanham Act.

AARP responds only with respect to injunctions under the Lanham Act, contending the court has jurisdiction to enjoin ARM, the Hennessys, American Family, Heritage, and the Normans for violations of the Lanham Act outside North Carolina. (Doc. 41 at 17-19; Doc. 42 at 18.) Once the court has jurisdiction over a party, it has authority under the Lanham Act to enjoin the party from unlawful conduct nationwide. 15 U.S.C. § 1116(a); SKS Merch, LLC v. Barry, 233 F. Supp. 2d 841, 850 (E.D. Ky. 2002); Five Platters, Inc. v. Purdie, 419 F. Supp. 372, 384 (D. Md. 1976).

The Lanham Act does not authorize nationwide service of process, ISI Int'l, 256 F.3d at 550, thus this court's jurisdiction is limited under Rule 4(k)(1)(A), Fed. R. Civ. P. Sea-Roy Corp. v. Parts R Parts, Inc., No. 9:94CV00059, 1996 WL 557857, at *4 (M.D.N.C. Jul. 30, 1996) ("in the absence of a

43

federal statute authorizing nationwide service of process, personal jurisdiction over a nonresident defendant may be obtained only pursuant to the provisions of [Fed. R. Civ. P. 4]"). Because this court's exercise of jurisdiction is specific, it naturally extends to damages resulting from conduct arising from claims related to North Carolina. To the extent AARP seeks relief beyond this, it has not demonstrated a basis in the briefing filed to date.[17] Defendants' motion to dismiss claims arising out of conduct other than mailings to North Carolina for lack of jurisdiction is therefore granted.

**V. CONCLUSION**

For the foregoing reasons, IT IS ORDERED that:

1. Defendants' motion to dismiss AARP's RICO claims (Doc. 19) is GRANTED as to the federal RICO claims AND DENIED as to the North Carolina RICO claims, and that Plaintiff's federal RICO claims are DISMISSED WITHOUT PREJUDICE;

---

[17] Defendants ARM, American Family, and Heritage also argue that this court lacks general jurisdiction over them. (Doc. 19 at 3; Doc. 27 at 11-15.) AARP does not contest these assertions and responds only to the argument that this court lacks jurisdiction to enjoin Defendants' illegal conduct outside North Carolina. (Doc. 41 at 17-19; Doc. 42 at 18.) Therefore, the court treats the motions as uncontested and concludes that it lacks general jurisdiction over these corporate Defendants. M.D.N.C. R. 7.4(k). ARM, American Family and Heritage concede specific jurisdiction exists over them in North Carolina for mailings that were sent into the state (Doc. 20 at 17; Doc. 27 at 11-14) but have joined in the motions to dismiss claims not related to mailings into North Carolina (Doc. 19 at 4; Doc. 20 at 17-19). Thus, the court finds that specific, but not general, jurisdiction exists over ARM, American Family and Heritage.

2.  The motions to dismiss by Defendants Tina Hennessy, Tom Hennessy, Jeffrey Norman, and Stanley Norman for lack of personal jurisdiction (Docs. 19 & 27) are DENIED; and

3.  Defendants' motions to dismiss claims relating to conduct other than activity directed to North Carolina (Docs. 19, 20 & 27) are GRANTED.


                                    /s/   Thomas D. Schroeder
                                  United States District Judge

February 25, 2009